# Illinois Official Reports

## Appellate Court

---

### *Centrue Bank v. Voga*, 2017 IL App (2d) 160690

---

| | |
|---|---|
| Appellate Court Caption | CENTRUE BANK, Plaintiff, v. LYLE L. VOGA, LARRY VOGA, LOIS ENGLERT, SHIRLEY BUSCH, LINDA JOAN FRISBEE, and ROBERT DuFAU, Defendants (Lyle L. Voga, Defendant and Counterplaintiff-Appellant; Larry Voga, Lois Englert, and Linda Joan Frisbee, Defendants and Counterdefendants-Appellees). |
| District & No. | Second District<br>Docket No. 2-16-0690 |
| Filed | June 22, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kendall County, No. 08-CH-871; the Hon. Robert P. Pilmer, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Steven T. Mann, of Caughey, Legner & Freehill, of Pontiac, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, Carl J. Elitz and Nadine J. Wichern, Assistant Attorneys General, of counsel), for intervenor-appellee Lisa Madigan.<br><br>Richard J. Tarulis, of Brooks, Tarulis & Tibble, LLC, of Naperville, for appellee Linda Joan Frisbee. |

Julie L. Cibulskis, of Speers, Reuland & Cibulskis, P.C., of Aurora, for appellee Lois Englert.

Jeffrey G. Sorenson, of Howard & Howard Attorneys PLLC, of Peoria, for appellee Centrue Bank.

Panel                        JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Hutchinson concurred in the judgment and opinion.

## OPINION

¶ 1        Defendant and counterplaintiff, Lyle Voga (Lyle), appeals various rulings of the circuit court of Kendall County in this dispute over a trust established by Lyle's late father, Leroy Voga (Leroy). For the following reasons, we disagree with Lyle that the trial court erred in vacating the judgment in Lyle's favor on counts IX and X of Lyle's original countercomplaint. However, we agree that the trial court erred in granting the motion of defendants and counterdefendants Lois Englert (Lois) and Larry Voga (Larry) to dismiss count X of Lyle's original countercomplaint, which was later repled as count V of his amended countercomplaint. We reverse the trial court's dismissal of that count as well as its judgment, following a bench trial, on the remaining counts of Lyle's amended countercomplaint. We remand for further proceedings consistent with this opinion.

¶ 2                                I. BACKGROUND
¶ 3        Lyle, Larry, Lois, and defendant and counterdefendant Linda Joan Frisbee (Linda) are the children of Leroy. In January 2003, Leroy executed a revocable living trust (Trust). He designated himself as trustee and Linda as primary successor trustee. At the time, Leroy owned several parcels of real property used as farmland. The Trust contained the following provisions pertinent to this case. Upon Leroy's death, Lyle, Larry, and Linda would each receive a separate parcel of real property, and Shirley Busch (Shirley), Leroy's companion, would receive a life estate in his Arizona residence. No gift of real estate was made for Lois. The Trust directed that the four siblings would each receive a 25% share of the residue of Leroy's estate.

¶ 4        Also in January 2003, Leroy executed a durable power of attorney (POA) that designated Linda as agent. Section 9 of the POA gave the agent general power to amend any trust of which Leroy was the trustor, but it did not specifically designate any such trust.

¶ 5        On September 25, 2006, Linda executed, as agent under the POA, an amendment to the Trust (Amendment). The Amendment retained the bequests of real property to Lyle, Larry, and Linda. The Amendment also retained, with some qualifications, the life estate to Shirley in the Arizona residence. The Amendment added a bequest that is central to this appeal. The

Amendment provided that Lois would receive upon Leroy's death "an amount of cash *** equal to the average fair market value by certified appraisal of the farm real estate gifted to [Linda] *** and the farm real estate gifted to [Larry]." The Amendment retained the four siblings' residuary interests of 25% each.

¶ 6 In February 2007, the four Voga siblings signed an agreement titled "Agreement Between Primary Beneficiaries to Designate Co-Trustees" (Co-Trustee Agreement), which purported to make the siblings co-trustees of the Trust.

¶ 7 In May 2007, plaintiff, Centrue Bank, filed an interpleader action (see 735 ILCS 5/2-409 (West 2006)) against the four Voga siblings, Shirley, and Robert DuFau, who was one of the successor trustees under the Trust. Centrue alleged that Lyle and Larry, citing the Co-Trustee Agreement, demanded that Centrue turn over to them certain Trust property it held, namely accounts and the contents of a safe deposit box. Centrue refused their demand out of suspicion that the Co-Trustee Agreement was invalid because it lacked the signature of Shirley, one of the Trust's primary beneficiaries. Centrue sought direction from the court as to the disposition of the property.

¶ 8 In August 2010, Lyle filed a 13-count countercomplaint against Larry, Linda, and Lois. Larry and Lois answered the complaint and filed affirmative defenses. Subsequently, Lyle filed an additional count against Linda.

¶ 9 In June 2011, Lyle filed a motion under section 2-615(e) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615(e) (West 2010)) for judgment on the pleadings on counts IX and X of his countercomplaint. These counts alleged that the Amendment was void because the POA, Linda's purported authority for executing the Amendment, did not comply with statutory requirements. Count IX alleged that the POA was not in the form authorized by section 3-4 of the Illinois Power of Attorney Act (Act) (755 ILCS 45/3-4 (West 2006)). Count X alleged that the POA did not specifically mention the Trust as an instrument that Linda could modify, as required by section 2-9 of the Act (755 ILCS 45/2-9 (West 2006)). Lyle further alleged in count X that the POA, as "a common law power of attorney," expired prior to the execution of the Amendment because of Leroy's mental incapacity. Lyle asked in his section 2-615(e) motion for a finding that the Amendment was void for the reasons stated in counts IX and X. Neither Larry, Linda, nor Lois filed an objection to the motion.

¶ 10 At the July 14, 2011, hearing on the motion, Lyle, Larry, and Lois appeared with counsel, but Linda did not appear. The court noted that Linda's nonappearance was anticipated. Counsel for Larry concurred, remarking that Linda did not "have much of any interest" in the proceeding since she had sold to a third party the real property she received under the Trust. After Lyle's counsel presented his arguments, counsel for Lois pointed out that, in October 2010, Larry and Linda executed assignments in favor of Lois (Assignments). In the Assignments, copies of which are in the record, Larry and Linda each assigned to Lois his or her 25% share of the Trust residue, "up to the amount that is equal to one-fourth (¼) of the value of the Special Gift provided for [Lois] in [the Amendment]" (the "Special Gift was the bequest of "cash *** equal to the average fair market value by certified appraisal of the farm real estate gifted to [Linda] *** and the farm real estate gifted to [Larry]"). Each Assignment stated: "This Assignment is made in respect of and pursuant to [the] Amendment, which I believe reflects my father's [Leroy's] wishes, regardless of whether the Amendment is valid."

¶ 11 Counsel for Lois commented as follows on the Amendment, the Assignments, and the merits of Lyle's motion:

- 3 -

"I think [counsel for Lyle] is correct technically but I would just like the court to know that in recognition of [the Amendment] and the special gift that was given to Lois, two of the other beneficiaries of [the Trust] have assigned their interests in the residue to Lois. I don't think it affects the invalidity of [the POA] at all, but I just wanted the court to be aware that certain of the beneficiaries in this case would submit to the court that it was truly the intent of [Leroy] to benefit Lois in the way that she was to be benefitted under [the Amendment], that was truly his intent, but there is no question about it technically under the law [that] [the POA] did not properly identify [the Trust] and [Linda] was probably without the power to amend [the Trust]."

¶ 12    Counsel for Larry said:

"[F]rom my point of view ***, [counsel for Lois] is absolutely correct. We thought it was [Leroy's] intent and so *** we've assigned our interest in the residue."

¶ 13    After the parties concluded their remarks, the trial court noted that it had received from Lyle a proposed order granting his motion for judgment on the pleadings. The order contained several paragraphs of findings that essentially reiterated the allegations of counts IX and X. The court confirmed with opposing counsel that they had seen the order and had no objection "as to the form." The court then granted Lyle's motion and entered the order.

¶ 14    Six months later, in January 2012, Linda filed a motion to vacate the July 2011 judgment. Linda alleged as follows:

"2. The [POA and the Amendment] were prepared by [Leroy's] attorney.
***
4. The effect of [the Amendment] would be to deplete the entire Estate, so that there would be no residue to distribute.

5. [Linda and Larry] assigned their share of the Trust residue to [Lois], in respect of [the Amendment], which they believed reflected [Leroy's] wishes.

6. Prior to the Court hearing on July 14, 2011, all parties except [Lyle] determined that it was not cost efficient to litigate the validity of [the POA and the Amendment].

7. The Court did not conduct any hearing on July 14, and the parties did not submit any evidence or present any argument.

8. The Court Order dated July 14 made findings which are not supported by the record.

9. The Court Order was not reviewed by [Linda] or her counsel prior to July 14, and was never served upon them. A copy of the Court Order was obtained from the Court Clerk in November, 2011.

10. In October, 2011, [Lyle] filed a Complaint in federal court, in the Northern District of Illinois, alleging a breach of fiduciary duty by [Linda] as Trustee for [the Trust], based in part on [the POA and the Amendment].

11. Since this Court did not make any determination on the merits of Counts IX and X of Lyle's [countercomplaint], this Court's Order should not be precedential in the federal court litigation."

In his written response, Lyle claimed that the July 2011 judgment was a final judgment and that Linda failed to meet the requirements of section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2010)) for relief from such a judgment more than 30 days after its entry.

¶ 15    At the hearing on the motion to vacate, Linda commented that the July 2011 judgment was "being manipulated in federal court in a different case to establish that [Linda] manipulated [the Trust] and violated her fiduciary duty." Lois stated that she had no objection to Linda's motion to vacate. She added that there was no harm in vacating the order, but that there was the possibility of "serious harm" if the judgment was *not* vacated. Larry stated that he agreed with Linda and Lois. He observed that the July 2011 judgment "was entered without a hearing at a time when the parties and previous counsel for [Lyle] were attempting to solve mass and big picture issues and working together on things."

¶ 16    The trial court granted Linda's motion and vacated the July 2011 judgment. The court reasoned:

> "Well, no judge likes to vacate an order after 30 days simply because we like to say what's done is done and move on, but in this case I don't see the harm done in vacating it. The indication is they're not likely to pursue it here. It's already being litigated in federal court which that's certainly the parties' options to do that."

¶ 17    In June 2012, Larry and Lois jointly filed a motion seeking both dismissal of count X of Lyle's countercomplaint and a declaratory judgment. The motion to dismiss was pursuant to section 2-619(a) of the Code (735 ILCS 5/2-619(a) (West 2012)). As noted, count X was one of two counts (the other being count IX) alleging that the POA did not give Linda authority to execute the Amendment. Larry and Lois argued that count X should be dismissed pursuant to the doctrine of election as it was articulated by the First District Appellate Court in *In re Estate of Boyar*, 2012 IL App (1st) 111013 (*Boyar I*). The First District explained the doctrine as holding that "any person who voluntarily accepts a beneficial interest under a will is held thereby to ratify and confirm the entirety of the will that conferred the benefit." *Id.* ¶ 28. The court held, as an issue of first impression, that the doctrine applied to trusts and not only to wills. *Id.* ¶ 35. The court noted that "courts recognize only two exceptions to the doctrine of election." *Id.* ¶ 40. The first exception applies where the party who accepted the bequest lacked, at the time, "full knowledge of the relevant facts and circumstance, including the contents of that [testamentary] document and the circumstances surrounding its execution." *Id.* The second exception applies where the party "question[s] the validity of any provisions of the document that are contrary to the law or public policy." *Id.* The First District determined that neither exception applied in that case, and it affirmed the dismissal of the petitioner's challenge to the validity of a trust amendment. *Id.* ¶ 41.

¶ 18    Notably, after the court resolved Larry and Lois's motion, but while the present case was still pending below, the supreme court reversed the appellate court's decision in *Boyar I*. See generally *In re Estate of Boyar*, 2013 IL 113655 (*Boyar II*). The court declined to hold whether the doctrine of election applied to trusts, because the elements of the doctrine would not have been met under the facts of that case anyway. *Id.* ¶¶ 36-39.

¶ 19    Arguing under *Boyar I*, Larry and Lois contended in their motion that the doctrine of election applies to trusts and, as applied in this case, barred Lyle from challenging the Amendment, because he "received and continued to receive benefits from the Trust Estate." Larry and Lois also asked for a declaration that, under the Trust's no-contest clause, Lyle forfeited any interest in the Trust.

¶ 20    The trial court held a hearing and received argument on the motion. The court took the matter under advisement and later issued a written order dismissing count X. The court held that the doctrine of election applied to the Trust and that Lyle's "acceptance of the benefits

conferred by the Trust preclud[ed] him from *** challenging the terms of the [T]rust that conveyed the benefits upon him." The court further determined (without providing reasons) that neither of the two exceptions to the doctrine applied. However, the court denied the request for a declaratory judgment, finding that it would be "unfair and unjust" to enforce the no-contest clause against Lyle.

¶ 21 In February 2013, Lyle filed a five-count amended countercomplaint against Larry, Linda, and Lois. Count I sought an accounting of Trust assets, and count II sought an apportionment of liability for estate taxes. In count II, Lyle alleged that he had opted, pursuant to section 2032A of the Internal Revenue Code, for a "special valuation" for the farmland that he received under the Trust, which resulted in reduced tax liability for that land. 26 U.S.C. § 2032A (2012). Count III alleged breach of fiduciary duty by Larry and Lois. Counts IV and V, seeking a declaratory judgment regarding the POA and the Amendment, essentially restated, respectively, counts IX and X of the original countercomplaint. Because of these parallels, the trial court noted in a subsequent order that it had previously disposed of counts IV and V.

¶ 22 Larry and Lois filed answers to the amended countercomplaint. Larry also filed an affirmative defense asserting that Lyle's own failure to act with equity barred his claims that Larry and Lois breached their fiduciary duties.

¶ 23 In November 2014, Lyle moved for summary judgment on count II of his amended countercomplaint. Lyle claimed that the tax savings from his "special valuation" election under section 2032A should be assigned to him alone rather than apportioned among him and his siblings. In response, Larry, Linda, and Lois pointed to article 5, section 5, of the Trust, which states that, with exceptions not pertinent here, "all expenses, claims and taxes attributable to any specifically distributed property shall be apportioned to the share of the beneficiaries of such specific distributions." Following a hearing, the trial court denied Lyle's motion, ruling that "estate tax liability shall be pro-rated based on the amount of estate tax generated by the value of the assets received by each beneficiary."

¶ 24 In December 2015, the Illinois Attorney General was granted leave to file a complaint in intervention. The complaint named the four Voga siblings and sought recovery of Illinois estate taxes, interest, and penalties.

¶ 25 In March 2016, the trial court held a bench trial on the remaining counts (I, II, and III) of Lyle's amended countercomplaint and the complaint in intervention. Witnesses at the trial were Lyle, Lois, Linda, and accountant James Riley.

¶ 26 The trial court issued its written decision in June 2016 and amended it in July 2016. The court calculated the total value of the Trust assets at $2,696,155.77 for federal estate tax purposes and at $2,542,155.77 for state estate tax purposes. The court determined that the siblings had received the following total assets: Lyle, $1,118,856.57; Linda, $761,062; Larry, $468,867.77; and Lois, $347,369.43. The court noted that, although Lois had not received the cash gift provided for her in the Amendment, she did receive $108,000 from Larry and Linda pursuant to the Assignments. The court also found it appropriate to award Lois the Arizona residence, valued at $154,000 (there was testimony at trial that Shirley's whereabouts were unknown). The court apportioned to each sibling the percentage of the estate tax liability that corresponded to the percentage that the sibling received of the taxable Trust assets.

¶ 27 The court found that Lyle's breach-of-fiduciary-duty claim was defeated by his own "unreasonable conduct," specifically, his "fail[ure] to communicate with his siblings regarding

the tax obligations due to [the Internal Revenue Service] and State of Illinois" and his "fail[ure] to account for his dealings with the [T]rust."

¶ 28 Finally, the court entered judgment for the Attorney General for delinquent estate taxes plus interest and penalties.

¶ 29 Lyle filed a motion to reconsider, which the trial court denied. He then filed this timely appeal. Only Lois has filed an appellee's brief.

¶ 30                                II. ANALYSIS
¶ 31                    A. Vacatur of the July 2011 Judgment in Favor of Lyle on
                          Counts IX and X of His Original Countercomplaint
                          (Counts IV and V of His Amended Countercomplaint)

¶ 32 Lyle's first contention on appeal is that the trial court erred by vacating the July 2011 judgment in his favor on counts IX and X of his original countercomplaint (counts IV and V of his amended countercomplaint). According to Lyle, the judgment was a final judgment and, because Linda sought vacatur more than 30 days beyond the entry of the judgment, her motion was governed by section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2010)). That section provides a mechanism for challenging a final judgment more than 30 days after its entry. To prevail under section 2-1401, "the petition must set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition." *Warren County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 37 (citing *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986)).

¶ 33 Lyle is mistaken to presume that section 2-1401 applied to Linda's motion. Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) states:

> "(a) Judgments As To Fewer Than All Parties or Claims—Necessity for Special Finding. If multiple parties or multiple claims for relief are involved in an action, an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both. Such a finding may be made at the time of the entry of the judgment or thereafter on the court's own motion or on motion of any party. The time for filing a notice of appeal shall be as provided in Rule 303. In computing the time provided in Rule 303 for filing the notice of appeal, the entry of the required finding shall be treated as the date of the entry of final judgment. *In the absence of such a finding, any judgment that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties*." (Emphasis added.)

¶ 34 In the absence of a Rule 304(a) finding, a judgment that adjudicates fewer than all the claims in a case is neither enforceable nor appealable. Until the entry of a final judgment disposing of all the claims in the case, an unenforceable and unappealable judgment remains subject to revision pursuant to Rule 304(a). See *Home State Bank/National Ass'n v. Potokar*, 249 Ill. App. 3d 127, 137 (1993) ("Where a judgment disposes of fewer than all claims and lacks a finding of no just reason to delay enforcement or appeal pursuant to Supreme Court

Rule 304(a) [citation], it is subject to revision before the entry of a judgment that does in fact adjudicate all claims and liabilities of the parties."). Moreover, where a trial court retains its authority to revise a judgment under Rule 304(a), a party's attempt to have that judgment revised is not governed by section 2-1401. See *Washington Mutual Bank, F.A. v. Archer Bank*, 385 Ill. App. 3d 427, 432 (2008) ("[S]ection 2-1401 has no proper function while the trial court retains jurisdiction to modify its orders."); *Hopkins v. Illinois Masonic Medical Center*, 211 Ill. App. 3d 652, 655 (1991) (motion to vacate dismissal of a party from the lawsuit was not subject to section 2-1401).

¶ 35        Here, the trial court made no Rule 304(a) finding with respect to the judgment in favor of Lyle on counts IX and X. Consequently, the judgment remained subject to revision pursuant to Rule 304(a) and Linda was not required to proceed under section 2-1401 in attacking that judgment.

¶ 36        Lyle's argument on this issue proceeds entirely on the premise that section 2-1401 governed Linda's challenge to the July 2011 judgment. He fails to acknowledge the possibility that Linda's motion to vacate might have been governed by authority other than section 2-1401. Having determined that section 2-1401 is inapplicable, we would be justified in finding that Lyle has forfeited any further argument for failure to cite authority. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (points not supported by legal authority are forfeited). However, we briefly consider the argument that Lyle offers.

¶ 37        Lyle, focusing on the merits of count X, argues that the POA lacked the requisite specificity to authorize amendments to the Trust. This approach misses the mark. Neither the July 2011 judgment nor its vacatur was based on the merits of Lyle's section 2-615(e) motion. First, the only basis the trial court intimated for its decision to grant Lyle's motion was the agreement of the parties present. Though Lyle's proposed order contained substantive findings consistent with a ruling on the merits, the court's oral pronouncements control over its written order. See *In re William H.*, 407 Ill. App. 3d 858, 866 (2011). At the hearing on the motion, the court made no comment on the merits but simply asked if the parties agreed to the relief Lyle requested. After confirming that they agreed, the court stated: "All right, I will enter the order then." The court gave no indication that the merits of the motion figured into its decision.

¶ 38        Second, the court also did not reach the merits of Lyle's motion when it vacated the July 2011 judgment. The court's stated grounds for vacatur were that (1) there would be "no harm done in vacating [the judgment]," (2) Lyle was "not likely to pursue [the claims] here," and (3) the matter was "already being litigated in federal court." Significantly, Lyle does not claim that the court erred in failing to reach the merits of Lyle's motion, either in granting it or later in vacating the judgment. His only assertion actually relating to the grounds on which the court based the vacatur is that Linda's motion was filed over six months after the entry of the judgment. However, he does not explain how the delay caused him hardship. Consequently, we reject his contention and affirm the vacatur of the July 2011 judgment.

¶ 39                    B. Dismissal of Count X of Lyle's Original Countercomplaint
                          (Count V of His Amended Countercomplaint).

¶ 40        Next, Lyle challenges the grant of Larry and Lois's joint motion to dismiss count X of his original countercomplaint. Counts IX and X were reproduced in Lyle's amended countercomplaint as counts IV and V, respectively. Count X challenged the Amendment as

invalid because the POA did not specifically mention the Trust in granting Linda the power to amend trusts established by Leroy. The trial court determined that the doctrine of election barred Lyle's challenge to the Amendment. We note that the fate of count IX (count IV in the amended countercomplaint) can only be inferred from the record. Count IX also challenged the POA and the Amendment but on a different ground than count X. Count IX was not expressly the subject of the joint motion to dismiss or the trial court's order of dismissal, but we presume that it was dismissed as well since it was not adjudicated at trial. In any case, no issue is raised on appeal regarding count IX.

¶ 41 A motion to dismiss under section 2-619(a) of the Code admits the legal sufficiency of the plaintiff's complaint but asserts an affirmative matter that defeats the claim. *People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶ 18. The doctrine of election was the affirmative matter raised in Larry and Lois's motion. Our review of a dismissal under section 2-619(a) is *de novo*. *Burge*, 2014 IL 115635, ¶ 18.

¶ 42 Before proceeding, we note that the First District Appellate Court is, to date, the only Illinois reviewing court to decide whether the doctrine of election applies not only to wills but also to trusts. See *Boyar I*, 2012 IL App (1st) 111013, ¶ 35. In *Boyar I*, the First District affirmed the trial court's dismissal of the petitioner's challenge to a trust amendment. The First District agreed with the lower court that the doctrine of election applies to trusts and that, as applied in that case, it barred the petitioner's challenge. *Id.* ¶ 36. In *Boyar II*, the supreme court reversed the dismissal. The court abstained from deciding whether the doctrine applies to trusts. The court noted that it did not need to decide that issue because, contrary to the First District's determination, the basic requisites of the doctrine would not have been met under the facts of the case. *Boyar II*, 2013 IL 113655, ¶¶ 36-39.

¶ 43 We decline to decide whether to follow *Boyar I*'s holding that the doctrine of election applies to trusts. Such a decision is unnecessary here because, even if the doctrine applies to trusts generally, the undisputed facts at hand do not satisfy the basic requisites of the doctrine.

¶ 44 The "ancient" doctrine of election, which "has fallen out of favor in modern times" (*id.* ¶ 28), has a very particular application. "Properly understood, the doctrine of election is triggered in the context of wills only when there are two different benefits to which a person is entitled, the testator did not intend the beneficiary to take both benefits, and allowing the beneficiary to claim both would be inequitable to others having claims upon the same property or fund." *Id.* To elaborate,

> "if a testator[,] intending to dispose of his property, includes in the disposition, property of another person, and at the same time gives to such other person an interest in the estate of the testator, such person will not be permitted to defeat the disposition made by the will and at the same time take under it. He is put to his election whether he will retain his own property or take the benefit conferred by the will. [Citations.]" *Carper v. Crowl*, 149 Ill. 465, 476 (1894).

Thus, "[e]lection under a will consists in the exercise of a choice offered a devisee or legatee of either accepting its benefits and surrendering some claim, right or property which the will undertakes to dispose of, or of retaining his claim, right or property, and rejecting the provisions made for him by the will." *Lloyd v. Treasurer of the State*, 401 Ill. 520, 525 (1948). "[T]he doctrine of election presupposes the existence of two inconsistent or alternative claims to property devised by the testator." *Boyar II*, 2013 IL 113655, ¶ 30. "Without such a choice, without the existence of inconsistent claims to trust property, one founded on the trust

document and the other predicated on some right existing independent of the document, there [is] simply no 'election' for [the party] to make." *Id.* ¶ 38.

¶ 45    *Lloyd* and *Remillard v. Remillard*, 6 Ill. 2d 567 (1955), are examples of "inconsistent claims to trust property, one founded on the trust document and the other predicated on some right existing independent of the document." *Boyar II*, 2013 IL 113655, ¶ 38. With the passing of Robert Brown, the testator in *Lloyd*, the beneficiaries, Millie Jarrett and her brother Lee Jarrett, were faced with the following election: (1) enforcing a prior oral agreement by Brown that he would provide in his will that the Jarretts could continue to occupy certain land after his death and would be reimbursed for improvements to the land if it was not ultimately sold to them and (2) taking under Brown's will, which carried out the terms of the oral agreement except that it did not provide for reimbursement for improvements. *Lloyd*, 401 Ill. at 521-22. After Brown died, the Jarretts continued to occupy the land but did not seek to enforce the oral agreement. *Id.* at 523. The supreme court held that, "[h]aving accepted the benefits provided for them by Brown's will, [the Jarretts] were estopped from asserting any claim under the oral agreement" and therefore could not seek reimbursement for improvements they made to the property. *Id.* at 525.

¶ 46    At the time of the testator's death in *Remillard*, his widow was faced with the choice of taking certain real property under his will or rejecting the bequest and taking her statutory homestead share in that same property. *Remillard*, 6 Ill. 2d at 569-70. The supreme court determined that the widow "elected to take under the will" and therefore relinquished her homestead interest. *Id.* at 570.

¶ 47    Here, the trial court found that Lyle made an election through "acceptance of the benefits conferred by the Trust," but the court identified no facts suggesting that Lyle's acceptance of those benefits was an election between inconsistent and alternative claims to trust property, "one founded on the trust document and the other predicated on some right existing independent of the document" (*Boyar II*, 2013 IL 113655, ¶ 38). Nor did Larry and Lois identify such facts in support of their motion to dismiss. Our own review of the record discloses nothing to indicate that Lyle's acceptance of trust property was properly an "election" as understood under the doctrine. Therefore, we hold that the trial court erred in holding that the doctrine of election barred Lyle's challenge to the Amendment.

¶ 48    Lois, however, notes that the supreme court in *Boyar II* also applied a principle of equity, "separate and apart from the doctrine of election." *Id.* ¶ 40. This principle holds that, "once one accepts some benefit, one cannot then challenge the validity of the thing by which the benefit was conferred." *Id.* The principle has been referred to as a "general rule of preclusion or estoppel." *Kyker v. Kyker*, 117 Ill. App. 3d 547, 551 (1983). We refer to it as the "estoppel principle" for purposes of our discussion. "It is based on principles of logic, fairness and consistency which are self-evident: Unless you acknowledge that a decree, statute, contract, etc., is valid, then by what right can you claim the benefit you accepted under its terms?" *Boyar II*, 2013 IL 113655, ¶ 40. The supreme court noted in *Boyar II* that the principle "has been applied in a variety of contexts, including challenges to divorce decrees [citation] and other judgments [citation], contract disputes [citations] and statutory challenges [citation]." *Id.* It has also been applied, we note, to will contests, where it is articulated as follows:

> "The well-settled equitable doctrine in this State *** is that any person who voluntarily accepts a beneficial interest under a will is held thereby to ratify and confirm the entirety of the will which conferred the benefit. In other words, the

beneficiary may not accept a bequest of the testator and at the same time set up any right or claim which would defeat or prevent the full operation of the will." *Kyker*, 117 Ill. App. 3d at 551.

In *Boyar II*, the supreme court appeared to accept that the estoppel principle, already so widely applied, should operate in trust challenges as well. *Boyar II*, 2013 IL 113655, ¶ 38.

¶ 49        The estoppel principle and the doctrine of election "are not identical" (*id.* ¶ 41); the former has broader application than the latter. Nonetheless, there is "some conceptual overlap." *Id.* This explains why the estoppel principle has been erroneously confused with the doctrine of election. See *In re Estate of Joffe*, 143 Ill. App. 3d 438, 440-41 (1986) (describing the "doctrine of election" as holding that "one cannot simultaneously accept benefits conferred by a will while setting up claims contrary to the terms of the document itself").

¶ 50        We can affirm the dismissal of a complaint on any basis appearing in the record. *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004). We consider whether the estoppel principle, cited by Lois, is an independent bar to Lyle's challenge to the POA and the Amendment. Lyle claims that the principle has no application here because he has not received "any settled distribution out of the trust remainder," and, therefore, there is no basis on which to find him estopped. The record shows that Lyle has indeed received interests under the Trust. Nonetheless, Lyle's challenge is not barred because one of the two exceptions to the estoppel principle applies here.

¶ 51        Consistent with their conceptual overlap, the estoppel principle and the doctrine of election share the same two longstanding exceptions. See *Boyar II*, 2013 IL 113655, ¶ 32 (stating exceptions to the doctrine of election); *Kyker*, 117 Ill. App. 3d at 551-52 (stating exceptions to the estoppel principle). As framed in the context of a will contest, the two exceptions to the estoppel principle are as follows:

        "First, acceptance of a bequest under a provision of the will must have been made with full knowledge of the relevant facts and circumstances [citations], including the contents of the will and the circumstances surrounding execution of the will [citations], and must not have been procured or induced by fraud or mistake [citations]. Second, even though a person accepts a benefit under the will, she is not precluded from questioning the validity of any provisions that are contrary to the law or public policy. [Citations.]" *Kyker*, 117 Ill. App. 3d at 551-52.

¶ 52        We focus here on the "contrary to law or public policy" exception. We discuss some cases to illustrate the application of that exception.

¶ 53        In *Kyker*, 117 Ill. App. 3d at 552, the court held that a challenge that the testator was under undue influence or lacked testamentary capacity did not constitute a challenge that a will provision was "contrary to law or public policy." Unfortunately, the court provided no reasons for its conclusion.

¶ 54        In *Schuknecht v. Schultz*, 212 Ill. 43 (1904), the complainant challenged certain testamentary gifts as invalid under the rule against perpetuities. The chancellor in equity rejected the challenge and dismissed the complaint. *Id.* at 45. On appeal, the appellees proposed, as an independent ground for affirmance, that the challenge was barred by the estoppel principle. The supreme court rejected that ground, noting that the complainant's challenge was that the bequests were void for remoteness. The court acknowledged that one who takes a beneficial interest under a will is "bound to confirm and ratify every other part of

the will." *Id.* at 48. This principle does not, the court explained, prevent a party from alleging that a provision in the will is "illegal and void" and "must be treated as though never made and constituting no part of the will." *Id.* at 48-49.

¶ 55 Similar reasoning was employed by the Supreme Court of Montana in *In re Schmidt's Estate*, 38 P. 547 (Mont. 1894), which held that the estoppel principle did not bar a challenge that a charitable bequest contravened a statutory requirement that such a bequest is void unless executed at least 30 days prior to the death of the testator. The court said:

> "[The claim] that [the respondent] is attacking the will and claiming under it at the same time is wholly untenable. It is true that he does claim under the will, and it is also true that he does not attack it. He simply asks that the court obey the statute, and hold that the one bequest is void, as the law declares it shall be." *Id.*

¶ 56 *Schmidt's Estate* was cited with approval in *Elmore v. Carter*, 289 Ill. 560, 563 (1919), where the supreme court held that the estoppel principle did not bar the claim that a charitable bequest to a New York corporation was invalid because, contrary to New York law, the bequest was not made at least 60 days before the testator's death and, moreover, the corporation ceased to exist before the testator died.

¶ 57 Lyle's challenge to the Amendment is analogous to the challenges in *Schuknecht*, *Schmidt's Estate*, and *Elmore*. He attacks the Amendment as void because the POA did not specifically mention the Trust in its provisions authorizing amendments to trusts of which Leroy was the trustor. Section 2-9 of the Act (755 ILCS 45/2-9 (West 2006)) (which Lyle mistakenly cites as section 2-8) is titled "Preservation of estate plan and trusts" and provides in relevant part:

> "In exercising powers granted under the agency, including powers of amendment or revocation and powers to expend or withdraw property passing by trust, contract or beneficiary designation at the principal's death (such as, without limitation, specifically bequeathed property, joint accounts, life insurance, trusts and retirement plans), the agent shall take the principal's estate plan into account insofar as it is known to the agent and shall attempt to preserve the plan, but the agent shall not be liable to any plan beneficiary under this Section unless the agent acts in bad faith. *An agent may not revoke or amend a trust revocable or amendable by the principal or require the trustee of any trust for the benefit of the principal to pay income or principal to the agent without specific authority and specific reference to the trust in the agency.*" (Emphasis added.)

¶ 58 Section 9 of the POA was titled "Power to Create, Modify, or Revoke Trusts for My Benefit and Benefit of My Dependents." Its two paragraphs read as follows:

> "a. Establishment of Trusts
>
> I give my Agent the power to establish any trust with my assets for my benefit and the benefit of my issue and any of my dependents, or one or more of us, upon such terms as my Agent determines are necessary or proper; transfer any assets in which I have an interest to any such trust or to any such trust that I have created; and exercise in whole or in part, release, or let lapse any power I may have as an individual and not as a fiduciary under any trust whether or not created by me. My Agent may be Trustee of any trust established by my Agent.
>
> b. Amend, Revoke or Exercise Powers Over Existing Trusts

Other than a power that would constitute a general power of appointment under Section 2041 of the Internal Revenue Code of 1986, as amended, I give my agent the power to amend, revoke and/or exercise any and all other powers I could exercise under the terms of any trust of which I am a Trustor."

Neither here nor elsewhere in the POA was there specific mention of the Trust. Consequently, Lyle has articulated a challenge that the Amendment is void because the POA did not, contrary to section 2-9, specifically mention the Trust in granting Linda the power to modify trusts of which Leroy was the trustor. We do not decide the merits of Lyle's challenge. We simply determine that, as articulated by Lyle, the challenge can go forward because it meets the exception to the estoppel principle for claims alleging that a trust provision violates law or public policy.

¶ 59    Lois asserts that "neither [the POA] nor [the Amendment] were [*sic*] in contravention of the law." She does not elaborate (and we note incidentally that she conceded in July 2011 that Linda was "probably without the power to amend the [T]rust"). She also suggests that the "contrary to law or public policy" exception has the potential to swallow the estoppel principle,

"because the most common basis for questioning the validity of an estate planning document is to claim that it is contrary to law. The same 'contrary to law' argument made by Lyle Voga would apply in every estate contest that involved undue influence, fraud, [or] lack of testamentary capacity."

Lois's concern for the survival of the estoppel principle is premature. In *Kyker*, which Lois has overlooked, the court held that a will contest based on undue influence and lack of testamentary capacity did not meet the "contrary to law or public policy" exception. See *Kyker*, 117 Ill. App. 3d at 552. Thus, at least in Illinois, the exception holds no immediate danger of consuming the principle.

¶ 60    Lois also claims that the validity of the Amendment is irrelevant because that provision did not ultimately prejudice Lyle in the distribution of the Trust's assets. Lois notes that Lyle ultimately received 39.1% of the Trust's residue, which was in excess of his entitlement under the Trust even as amended (each sibling was to receive 25% of the residue). Lois's percentage calculations beg the question. They are based on the Trust residue as diminished in the very manner that Lyle challenges on appeal. The trial court awarded Lois the Arizona residence as apparently an equitable remedy for her not having received the cash bequest that the Amendment provided for her. (As noted, Shirley was given a life estate in the Arizona residence, but her whereabouts were unknown at the time of trial.) See *Church of the Little Flower v. US Bank*, 2012 IL App (4th) 120266, ¶ 17 (courts can deviate on equitable grounds from the terms of a trust). The award of the Arizona residence to Lois reduced—improperly, according to Lyle—the Trust residue available to the other siblings. On remand, the trial court, in adjudicating the reinstated count, might well dispose of the Arizona residence and other Trust assets differently. Lois's calculations fail to demonstrate that Lyle could fare no better from a revised distribution on remand.

¶ 61    Lois also contends that Lyle conceded the validity of the Amendment in signing the Co-Trustee Agreement in February 2007. As Lois cites no legal authority for this contention, it is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) (points not supported by citation to authority are forfeited).

¶ 62    For the foregoing reasons, we reverse the dismissal of count X of Lyle's original counterclaim (count V of his amended counterclaim). This entails reversal of the trial

court's judgment, following the bench trial, on the remaining counts of the amended countercomplaint: count I (accounting), count II (tax apportionment), and count III (breach of fiduciary duty). First, the court's adjudication of the accounting claim was based on the Trust's terms as modified by the Amendment; this was most evident in the award to Lois of the Arizona residence as an apparent equitable remedy for her failure to receive the cash bequest provided for her in the Amendment.

¶ 63    Second, counts I and III not only overlapped in the amended countercomplaint but were intertwined in the trial court's adjudication. "To sustain an action for an accounting in equity, the complaint must allege the absence of an adequate remedy at law and one of the following: (1) *a breach of a fiduciary relationship between the parties*; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature." (Emphasis added.) *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 500-01 (1986). Counts I and III alleged the same breach of fiduciary duty, namely, the failure of Larry and Lois to transfer to Lyle the real estate owed him under the Trust. Moreover, the trial court's disposition of count III relied on evidence of the siblings' dealings with Trust funds and with each other, all of which evidence was also pertinent to count I. The court specifically said of count III:

> "After carefully considering all of the testimony of the parties and witnesses, as well as the numerous exhibits admitted into evidence, the court finds that there was no breach of fiduciary duty owed by Linda, Lois or Larry to Lyle. Certainly, Lois received two checks for grain sales, which should have been paid to the Trust, but given the conduct of Lyle and Larry, the court cannot and will not find that Lois breached any duty to Lyle. Similarly, Larry received a substantial amount of funds to which he was not entitled, but he paid most of those back. The evidence was that when requested by the others, it was Lyle who failed to account for his dealings with the [T]rust. His unreasonable conduct continued up to the time of trial, as the testimony was that Lyle failed to communicate with his siblings regarding the tax obligations due to [the Internal Revenue Service] and State of Illinois. Ultimately, as a result of that failure to communicate, funds which may have gone to Lois will instead be paid to the State of Illinois. As to Linda, there was no evidence that she did anything inappropriate with assets of the Trust estate, and the court finds that she did not breach any fiduciary duty owed to the others."

¶ 64    Third, the trial court apportioned tax liability (under count II) based on the taxable property received by each sibling. In Lois's case, her taxable property included the Arizona residence. On remand, the trial court, giving proper consideration to Lyle's challenge to the Amendment, might well make a different disposition of the Arizona residence or other Trust assets. Consequently, we remand for a new trial on count II as well.

¶ 65                    C. Apportionment of Federal Estate Tax Liability

¶ 66    Although we remand for a new trial on count II, Lyle's challenge to the trial court's tax apportionment raises a question of law that we choose to address in the interest of judicial economy because it is likely to recur on remand. See *Aasonn, LLC v. Delaney*, 2011 IL App (2d) 101125, ¶ 27 (addressing a question of law likely to recur on remand).

¶ 67    The issue is how to treat the tax benefit incurred by Lyle's obtaining a reduced valuation, pursuant to section 2032A, for the farmland gifted to him. "The purpose of § 2032A, which was enacted as part of the Tax Reform Act of 1976, was 'to encourage the continued operation

- 14 -

of family farms and other small family businesses by permitting real property used for the farm or business to be valued upon its present use, rather than upon its highest and best use.' " *Finfrock v. United States*, 860 F. Supp. 2d 651, 654 (C.D. Ill. 2012) (quoting *Schuneman v. United States*, 783 F.2d 694, 697 (7th Cir. 1986)). Specifically, " '§ 2032A relieves taxpayers from having to sell an eligible family farm or business when the income from its present use is insufficient to pay the tax calculated upon its highest and best use.' " *Id.* (quoting *Schuneman*, 783 F.2d at 697).

¶ 68    Lyle contends that the tax savings he obtained from the reduced valuation for his property should be accorded to him alone rather than distributed among the four siblings. Lyle wants this benefit in the form of a credit against his tax liability commensurate with the savings he afforded the estate. Lyle's contention has no merit. "The Federal estate tax is a tax which is levied against the decedent's estate as a whole." *In re Estate of Grant*, 83 Ill. 2d 379, 381 (1980). "It is thus distinguishable from the inheritance tax, which is levied individually upon each beneficiary in an estate." *Id.* "Although the estate tax is paid by the executor, the law of the individual States determines which parties bear the ultimate tax burden." *Id.* Illinois has no statute on the subject. The rule developed by courts in the absence of statutory guidance is that, unless the instrument specifies otherwise, the federal estate tax will be equitably apportioned. *In re Estate of Gowling*, 82 Ill. 2d 15, 21 (1980).

¶ 69    The Trust specifies how the estate tax is to be apportioned. The goal in construing a trust document is to give effect to the trustor's intent. *Gwinn v. Gwinn*, 2016 IL App (2d) 150851, ¶ 16. We do so by according the language of the document its plain and ordinary meaning where possible. *Id.*

¶ 70    Article 5, section 5, of the Trust states that, with exceptions not relevant here, "all expenses, claims, and taxes attributable to any specifically distributed property shall be apportioned to the share of the beneficiaries of such specific distributions." Applying this language, the trial court computed the total estate assets and total federal tax liability, and it then assigned tax liability to each sibling according to the portion that the sibling received of the total estate assets: Linda, 28.23%, Larry, 17.39%, Lyle, 41.50%, and Lois, 12.88%. The court rejected Lyle's request for an offset to his proportionate tax liability. The court was correct. The Trust's language is explicit that beneficiaries are liable for taxes proportionate to the share they receive of the trust assets. The language makes no provision for a beneficiary to receive an offset to his respective liability due to a reduced asset valuation. Such an offset would directly contravene the express direction of the Trust by requiring the remaining siblings to compensate for the offset by paying in excess of what their proportionate shares of the Trust's assets would dictate. "When the language of the document is clear and unambiguous, a court should not modify or create new terms." *Ruby v. Ruby*, 2012 IL App (1st) 103210, ¶ 19. Lyle claims that he deserves such an offset because he incurs expenses in farming the property in order to maintain its eligibility for the reduced valuation. However, he cites no authority for us to depart in these circumstances from the clear import of the trust language.

¶ 71    Lyle relies on *Gowling* and *In re Estate of Lyons*, 98 Ill. App. 3d 995 (1981). Those cases are distinguishable because the instruments there, unlike the instrument here, did not specify how the federal estate tax should be apportioned; hence, the default rule of equitable apportionment applied in those cases.

¶ 72 We hold that the trial court did not err in declining to grant Lyle an offset to his proportionate liability for the federal estate tax.

¶ 73                                    III. CONCLUSION
¶ 74 For the foregoing reasons, we reverse the judgment of the circuit court of Kendall County and remand for further proceedings consistent with this opinion.

¶ 75 Reversed and remanded.